Third Party Administration
Service Agreement

THIS AGREEMENT, made and entered into as of the _1st_ day of _September_ 2000, by and between **Diversified Concepts, Inc.** having an office for business at 232 Madison Avenue, New York, New York 10016 (hereinafter referred to as the **Broker Consultant**); **Fulton/Highpoint Chevrolet** having an office for business at P.O. Box 519, Middletown, NY 10940 (hereinafter referred to as the **Contract Holder**); and **SIEBA, LTD.**, a New York corporation having its principal place of business located at 111 Grant Avenue, Suite 100, PO Box 5000, Endicott, New York 13761-5000 (hereinafter referred to as **SIEBA**).

WHEREAS, the **Contract Holder** has established certain employee welfare benefit plans (hereinafter referred to as the **Plan(s)**) for certain of its employees and their dependents; and

WHEREAS, benefits payable under the provisions of the **Plan(s)** constitute liabiilties of the **Contract Holder**; and

WHEREAS, the **Contract Holder** desires **SIEBA** and the **Broker Consultant** to furnish services necessary in the administration of certain aspects of the **Plans**; and

WHEREAS, **SIEBA** and the **Broker Consultant** are willing to provide such services in accordance with this Agreement, the **Plan(s)**, and the Employee Retirement Income Security Act of 1974 as amended (ERISA) and other applicable laws or regulation; and

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement, the **Contract Holder**, **SIEBA**, and the **Broker Consultant** agree as follows:

**ARTICLE 1 – CERTAIN RESPONSIBILITIES OF SIEBA AND THE CONTRACT HOLDER**

a) It is understood that the **Contact Holder** retains all final authority and responsibility for the **Plan(s)** and its operation and that **SIEBA** is empowered to act on behalf of the **Contract Holder** in connection with the **Plan(s)** only as expressly stated in this agreement or as mutually agreed to in writing by **SIEBA** and the **Contract Holder**. In consideration whereof, the **Contract Holder** agrees to indemnify and hold harmless **SIEBA** and it directors, officers and employees against any and all claims, lawsuits, settlements, judgments, costs, penalties and expenses, including attorneys' fees, resulting from, or arising out of or in connection with any function of **SIEBA** under this agreement or in connection with a claim of this agreement, except those claims, lawsuits, settlements, judgments, costs, penalties and expenses arising out of **SIEBA's** negligence, recklessness or intentional wrongdoing, or its failure to abide by this contract or applicable law. **SIEBA** agrees to indemnify and hold harmless the **Contract Holder** and its directors, officers and employees against any and all claims, lawsuits, settlements, judgments, costs penalties and expenses, including attorneys' fees, with respect to this agreement resulting from or arising out of the negligence, recklessness or intentional wrongdoing of **SIEBA**, their failure to abide by this contract or

applicable law, or the dishonest, fraudulent or criminal acts of **SIEBA** or its employees, acting alone or in collusion with others.

b) References in this agreement to directors, officers and employees of **SIEBA** shall be deemed to include directors, officers and employees of affiliated or subsidiary companies of **SIEBA**.

c) **SIEBA** will not be liable for invalid claim payments when such payments result from the failure of the **Contract Holder** to provide notice to **SIEBA** of a change in a participant's eligibility status under the **Plan** of Benefits. **SIEBA** shall notify the **Contract Holder** in an expeditious manner of the discovery of any overpayment which has not been repaid. The **Contract Holder** reserves full rights to proceed with any legal action against the overpaid party.

d) **SIEBA** acknowledges that all files and other documentation relative to the **Plan(s)** and maintained by **SIEBA** shall remain the property of the **Contract Holder** and be available to **Contract Holder** during normal business hours and at other times as mutually acceptable to **SIEBA, LTD.** and the **Contract Holder**.

e) **SIEBA** agrees to maintain a Fidelity bond and Errors and Omissions insurance covering **SIEBA**, at its own costs, and upon request will provide copies of certificate of insurance evidencing same.

## ARTICLE 2 – ADMINISTRATION SERVICES TO BE PROVIDED

SIEBA shall discharge its duties with respect to the Medical and Dental Plan (a) solely in the interest of participants, (b) for the exclusive purpose of providing benefits to participants, (c) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with like aims, and (d) in accordance with the **Plan(s)** and this Agreement.

In consideration of the compensation provided for in Article 5, **SIEBA** shall provide all reasonable and necessary services to the **Contract Holder** in administering the benefits provided by the **Plan(s)** and all claims arising thereunder, incurred on or after the effective date of this agreement, including, without limitation, the following services:

a) Establish and maintain a list of participants based upon data provided by and received from the **Contract Holder**.

b) Examination of claims as submitted by eligible participants for compliance with the terms of the Plan Document.

c) Determination of eligibility for reimbursement of covered expenses under the terms of the **Plan(s)** as required by the **Contract Holder**.

d) Issuance of claim checks and/or Explanation of Benefits to **Plan** participants and providers of services.

e)  SIEBA shall, upon receiving a notice of an employee termination, notify the appropriate parties of their COBRA rights and receive COBRA payments.

f)  SIEBA shall, to the extent possible, advise the **Broker Consultant** and **Contract Holder** as to matters which come to its attention involving the potential legal actions involving the **Plan(s)** and shall advise the **Broker Consultant** and **Contract Holder** in writing of legal actions commenced against the **Contract Holder** which come to its attention in an expeditious manner. The defense of any legal action involving a claim for benefits under the **Plan(s)** shall be the obligation of **SIEBA** under this agreement if the action arises out of the negligence, recklessness or intentional misconduct of **SIEBA** or their failure to abide by this contract or applicable laws.

g)  Provide enrollment forms, claim forms, explanation of benefit statements (EOBs), checks printed with the **Contract Holder's** name and logo.

h)  **SIEBA** shall be responsible for the storage of all records for a maximum of seven (7) years or upon termination of this agreement, which ever occurs first. At the end of that time the **Contract Holder** is responsible for all storage costs, retrieval and disposition of documents.

i)  **SIEBA** will prepare and provide on a monthly basis written reports which show total claim payments made for each service provided by the **Plan(s)**.

j)  **SIEBA** shall monitor all outstanding checks and reconcile the bank accounts on a monthly basis.

k)  Verification of full-time student status of all dependents.

l)  Generation and mailing of IRS Form 1099 to each provider of benefits under the **Plan(s)**, as required by governmental regulations. These forms shall show the **Contract Holder** as payor using the **Contract Holder's** TIN. **SIEBA** will provide **Contract Holder** with a report listing all 1099's filed on **Contract Holder's** behalf.

The **Contract Holder** agrees that **SIEBA** and **Broker Consultant** do not assume any liability for any consultation, diagnosis, treatment, care, service or supply provided to any participant in the **Plan(s)** by any physician or dentist and/or medical or dental service provider.

**SIEBA** and **Broker Consultant** agree, that unless otherwise directed by the **Contract Holder**, at all times it and its employees will hold in strict confidence any and all data and other information concerning the **Contract Holder**, its employee benefit **Plan(s)**, participating employees and covered participants and they will not use any such information for any other purpose than to administer the **Plan(s)**.

**SIEBA** agrees to follow the written directives, rules and procedures developed by the **Broker Consultant** and the **Contract Holder**.

ARTICLE 3 – OBLIGATIONS OF THE BROKER CONSULTANT

Provide benefit consulting services to **Contract Holder** for:

1. Cost estimates and projections;

2. Drafting of employee descriptive materials under the **Plan(s)**; as well as Summary Plan Descriptions;

3. Provide the benefit Plan Documents to the **Contract Holder**, the Excess Risk Insurer and **SIEBA**;

4. Assist with employee enrollment and communications;

5. Conduct negotiations with stop loss insurance carriers.

ARTICLE 4 – OBLIGATIONS OF THE CONTRACT HOLDER

During the period of this agreement, the **Contract Holder** agrees that it shall perform the following services and functions:

a) Produce and distribute to all participants in the **Plan(s)** all necessary plan documentation, including plan booklets and other plan materials as shall be required for the proper administration of the **Plan(s)**.

b) Furnish **SIEBA** and the **Broker Consultant** with accurate census data pertaining to the participants in the **Plan(s)**, and shall provide updated census data, as may be reasonably requested by **SIEBA** and the **Broker Consultant**, to maintain accurate data.

c) Furnish **SIEBA** and the **Broker Consultant** with such other data and/or information in writing as may be reasonably required and requested in writing by **SIEBA** and the **Broker Consultant** for the purpose of implementing the **Plan(s)**.

d) Pay all funding requirements of the **Plan(s)** as outlined in Article 7 expeditiously after receiving a written notice from **SIEBA** for the purpose of implementing the **Plan(s)**.

e) Filing of all other tax reports, plan documents, informational returns, and other filings with the state or federal governmental authorities as may be required by statute, rule or regulation. **SIEBA** shall furnish such necessary information as is contained in its files to the **Contract Holder** upon reasonable advance notice.

f) Review all proposed changes to the **Plan(s)** with **SIEBA** at least 14 days <u>before</u> such changes are made in order to be sure that such changes can be accommodated by **SIEBA's** internal systems. If changes to the **Plan(s)** require special system revisions or adaptations, the costs involved will be charged to the **Contract Holder.**

g) Communicate in writing to **SIEBA** and the **Broker Consultant** all **Plan** interpretations, policy decisions and directives made by the **Contract Holder.**

## ARTICLE 5 – TERM OF AGREEMENT

The term of this original agreement shall be for a period of two (2) years commencing on **September 1, 2000**, and shall continue until **August 31, 2002**, unless terminated by either party as set forth below.

**SIEBA** shall begin providing services related to the implementation of these **Plan(s)** upon execution of this agreement.

## ARTICLE 6 – COMPENSATION OF SIEBA AND BROKER CONSULTANT

a) Subject to the following paragraphs of this section, the administrative service charge for each month of this agreement shall be a fixed fee each month for each participant unit (as defined herein) under this agreement.

A schedule of monthly fees is shown in Schedule One.

b) For purposes of this agreement a *participant unit* is a covered employee or retiree who is eligible to participate under the **Contract Holder's Plan(s)**, including but not limited to:

1) any terminated employee that has elected to continue coverage under the **Plan(s)**, or

2) any dependent family or individual that has elected to continue coverage under the **Plan(s)** without the continuation of the terminated employee, or

3) any dependent family or individual that has elected to continue coverage under the **Plan(s)** as the result of their loss of dependent status.

c) For the purposes of computing the monthly fee, a participant unit covered under the terms of the Medical and Dental **Plan** on any day of the month shall be considered a participant unit for the entire month. The monthly fee shall be paid to **SIEBA.**

d) **SIEBA** will bill the **Contract Holder** for any special services that they are requested in writing to perform, such as computer programming and file retrieval, related but not limited to audits, consultant studies and special projects. These added expenses would be outlined to the **Contract Holder** upon a review of the scope of the audit before commencement of the process. Fees will be billed at the regular fee schedule rates in effect at the time the service is performed.

f) SIEBA and the **Broker Consultant** agree that the **Contract Holder's** sole obligation to pay any monies to **SIEBA** and the **Broker Consultant** shall be limited to the fees specified in Article 6a herein and that **SIEBA** and the **Broker Consultant** shall pay any and all expenses and charges of any kind incurred by **SIEBA** and the **Broker Consultant** in performing its obligations under this agreement.

g) The **Contract Holder** will be billed monthly by **SIEBA** for all fees described in Article 6a. This billing will be created prior to the month for which fees are due. These bills will show adjustments for prior month debits and credits.

These monthly bills will be paid to **SIEBA** who will make the necessary payments to the stop-loss carrier and **Broker Consultant**. These payments will be made within three (3) working days of **SIEBA** receiving the payments from the **Contract Holder**.

The **Contract Holder** will pay the monthly bills in an expeditious manner but no later than the 25th of the month billed.

## ARTICLE 7 – METHOD OF FUNDING

a) **SIEBA** will furnish the **Contract Holder** with a check register every week. Upon audit, the **Contract Holder** will expeditiously transfer funds to the **SIEBA** claim account. Once the claim account is funded, **SIEBA** will release the checks.

b) All benefit payments made under the **Plans** will be issued by **SIEBA** on drafts payable through the above account.

c) All cleared checks will be returned to **SIEBA** for purposes of reconciliation.

## ARTICLE 8 – DISCONTINUANCE OF AGREEMENT

a) This agreement may be discontinued at the earliest time specified below:

(i) As of the date of discontinuance of the **Plan(s)**, as specified to **SIEBA** by the **Contract Holder** provided that **SIEBA** has been given a thirty (30) day notice that the **Contract Holder** is discontinuing this agreement.

(ii) As of any date agreed to between the **Contract Holder** and **SIEBA**.

(iii) As of the last day of an agreement period, provided the **Contract Holder** has not approved continuation of the agreement by the end of the agreement period, and further provided that **SIEBA** and the **Broker Consultant** have been given thirty (30) days prior notice of the **Contract Holder's** intention not to continue.

    (iv)    Upon thirty (30) days prior written notice by **Contract Holder** to both **SIEBA** and the **Broker Consultant**.

b) In the event of failure of the **Contract Holder** to pay compensation to **SIEBA** and the **Broker Consultant** in accordance with Article 6, Compensation of **SIEBA** and **Contract Holder**, either party may, at its option, terminate this agreement by providing ten (10) days written notice to the **Contract Holder** of its failure to pay if such failure is not cured within ten (10) days after receipt of notice.

c) **Contract Holder** may terminate this agreement, notwithstanding Article 7 hereof, upon five (5) days prior written notice to **SIEBA** in the event of **SIEBA's** and the **Broker Consultant's** bankruptcy, whether voluntary or involuntary, insolvency, reorganization, inability to pay its creditors or any arrangement with creditors.

d) Discontinuance of this agreement shall not terminate the rights or liabilities of either party arising out of a period prior to such discontinuance.

## ARTICLE 9 – DUTIES UPON TERMINATION

Upon termination of this agreement, **SIEBA** will turn over to the **Contract Holder** any funds remaining in its control and all records of the **Contract Holder** and its participants. Records, files and documents shall be returned by **SIEBA** to the **Contract Holder's** address as described in Article 13 within seven (7) days of the **Contract Holder's** request. The **Contract Holder** shall be obligated to remove all **Plan(s)** files, books, records and other documentation from the offices of **SIEBA** no later than thirty (30) days following the effective date of termination of this agreement or as otherwise agreed to by the **Contract Holder** and **SIEBA**. These items will be made available to **Contract Holder** at date of termination.

Because the services provided by **SIEBA** include access to managed care provider panels owned or arranged for by **SIEBA**, the parties agree that upon termination of this agreement, **SIEBA** may be retained to provide continued services for health care expenses incurred prior to the termination of this agreement. The parties agree that **SIEBA** will be retained for a period of three (3) months from the termination date of this agreement. **SIEBA** will be compensated for said three (3) month period based on the then-current administration fee (as per Schedule One) multiplied by the annual average number of participating employees for the prior 12 month period multiplied by three (3) months. **SIEBA** agrees to continue to process all claims incurred prior to the termination of the agreement for a six (6) month period following termination of the agreement.

## ARTICLE 10 – CONFIDENTIALITY

**SIEBA** and **Broker Consultant** agree that, unless otherwise directed by the **Contract Holder**, at all times it and its employees will hold in strict confidence any and all data and other information concerning the **Contract Holder**, it employee benefit plans, participating employees and covered dependents. This clause shall remain in effect after termination of this agreement.

## ARTICLE 11 – RELATIONSHIP OF PARTIES

SIEBA agrees at all times to administer properly the employee benefits provided by the **Plan(s)** in accordance with the stated purposes of the **Contract Holder** as set forth in the plan document. In furtherance of the agreement hereby entered into between the parties, the **Contract Holder** and SIEBA acknowledge and agree that it is their intent to create a business relationship between them in which SIEBA is retained by the **Contract Holder** as an independent contractor only, and under no circumstances is SIEBA to be considered the employee or agent of the **Contract Holder**.

The **Contract Holder** acknowledges and agrees that SIEBA is acting as administrator for the payment of claims pursuant to the **Plan(s)**, but that nothing herein shall be construed or interpreted to mean that SIEBA has assumed the responsibilities of an insurer of claims under the **Plan(s)**.

## ARTICLE 12 – EXAMINATION AND MAINTENANCE OF RECORDS

The **Contract Holder** shall have the right to examine any records of SIEBA relating to benefit payments and request for benefit payments under the **Plan(s)** and the issuing of drafts for benefit payments under the **Plan(s)**; provided, that any examination of individual benefit payment records shall be carried out in a manner agreed to between the **Contract Holder** and SIEBA designed to protect the confidentiality of the participant's information. Any examination of records will be done at SIEBA during normal business hours and at the expense of the **Contract Holder**.

SIEBA shall keep and maintain all records for a maximum period of seven (7) years, during which period all book and records will be available to the **Contract Holder** for inspection and audit. If this agreement is terminated or not renewed, the provisions of Article 2 shall apply.

## ARTICLE 13 – NOTICES

Any notices which may or are required to be given hereunder must be in writing, and except as otherwise specifically provided herein, shall be given by mailing same by registered or certified mail, return receipt requested and addressed, if to **Contract Holder**, to PO Box 519, Middletown, New York 10940 and if to SIEBA, at 111 Grant Avenue, Suite 100, PO Box 5000, Endicott, New York 13761-5000, and if to **Broker Consultant**, to 232 Madison Avenue, New York, New York 10016, or to such other address or other persons as either party may designate hereinafter by such notice for the mailing of notices to it. All notices shall be deemed served and given when mailed.

## ARTICLE 14 – ENTIRE AGREEMENT

This agreement contains the entire agreement by the parties concerning the subject matter hereof, and, except as is specifically set forth herein, no prior representations, warranties, promises or statements made by either party to the other shall have or be given

any force or effect. All modifications to this agreement shall be null and void unless in writing and signed by the parties.

In the event any one or more of the provisions contained herein shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof and this agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

## ARTICLE 15 – BROKER OF RECORD

The services of **SIEBA** have been brokered through Diversified Concepts, Inc., 232 Madison Avenue, New York, New York 10016.

From monies paid to **SIEBA** under Article 6a above, the Broker of Record shall be paid monthly servicing fees in accordance with Schedule One.

## ARTICLE 16 – VENUE AND ARBITRATION

This agreement shall be governed by and construed in accordance with the laws of the State of New York. In the event that any action or proceeding is commenced by either party against the other, all such actions or proceedings shall be commenced and maintained within the County of Broome, State of New York.

In the event of any unresolved dispute or controversy between the parties, it is agreed that such dispute or controversy shall be resolved pursuant to the Commercial Arbitration Rules of the American Arbitration Association and any hearing under such rules shall be held in Endicott, New York.

**Fulton/Highpoint Chevrolet, Inc.**

By: _____  Dated: 9-8-00

**SIEBA, LTD.**

By: _____  Dated: 8/29/01

**DIVERSIFIED CONCEPTS, INC.**

By: _____  Dated: 9/6/00

# Schedule One
## Fulton/HighPoint

Effective Date: April 1, 2000

Specific Stop Loss Amount: $15,000 )Laser B. Christy, $30,000) Life Insurance: $10,000 per employee

Contract: Paid

Stop Loss Carrier: HCC Benefits/CNA                  Life Insurance Carrier: HCC Benefits/CNA

| Specific | Client Billed | Carrier Gross/Net | EM | SIEBA | DCI |
|---|---|---|---|---|---|
| Specific Single | 51.50 | 43.77 | | | 7.73 |
| Specific Family | 133.00 | 113.05 | | | 19.95 |
| Aggregate | 11.50 | 9.92 | | | 1.58 |
| Life Ins. & AD&D | .29/1000<br>.04/1000<br>3.30/person | .25/1000<br>.03/1000<br>2.80/person | | | .50 |
| Administration Single | 19.50 | | 1.50 | 13.25 | 4.75 |
| Administration Family | 21.50 | | 1.50 | 13.25 | 6.75 |
| Dental Single | 4.00 | | | 2.00 | 2.00 |
| Dental Family | 6.00 | | | 2.00 | 4.00 |
| New Enrollment | 10.00 | | | | 10.00 |
| COBRA | 25.00 | | | 20.00 | 5.00 |
| Network – SIEBA | 2.00 | | | 1.50 | .50 |
| Network – CHN | 4.00 | | | | .50 |

Monthly Aggregate Factors                  COBRA Rates

$195.00  Single                             Single
$453.00  Family                             Family

FHP fee



(845) 343-3184

Fax
(845) 343-5557



# FULTON
## CHEVROLET *Cadillac*

P.O. BOX 519
MIDDLETOWN, NEW YORK 10940-0519

February 27, 2002

Dick Dobell
SIEBA LTD
111 Grant Avenue Suite 100
PO Box 5000
Endicott, NY 13761-5000

Dear Mr. Dobell:

The purpose of this letter is to appoint Kenneth R. Hutchings of The Anchor Group Broker-Consultant (Broker of Record) for our Self-Funded Employee Benefit Plan, effective thirty (30) days from today. Please amend our Third Party Administration Service Agreement accordingly.

Mr. Hutchings' compensation will be fifteen (15) percent of the stop-loss Insurance premium.

Sincerely,

John A. Worts,
President



"HONESTY AND GOOD SERVICE IS OUR POLICY"

# AnchorGroup

## MEMO

3/15/02

To: Dick Dobell

From: Ken Hutchings Sr.

Subject: Fulton/Highpoint Chevrolet

This is to confirm the points agreed to at our meeting on March 14th:

1. Effective 4/01/02 Larry Turell is out. You will forward John a new agreement to be effective 4/01/02 with me named as the Broker/Consultant in place of Larry Turell. The agreement will state that my compensation regarding the self-funded health care plan will be the 15% stop-loss commission that Turell was receiving. It will be paid to me beginning with the April stop-loss premium. I will receive no "add on" administration fees such as Turell was receiving.
2. Express Scripts enrollments and terminations will be handled by SIEBA
3. The Group Life and AD&D premium payment will be handled by SIEBA. For those employees enrolling for both life & health coverage the standard SIEBA enrollment form will suffice as notification to add the employee to the life coverage. Notification that the employee is terminated for health will also prompt SIEBA to delete the employee from the life premium statement.

   Lori will notify SIEBA when they have an employee that should be added to the life bill that is not to be covered for health. She will do the same for employees in this category that terminate.

4. SIEBA and Ken Hutchings will develop a new SPD (plan booklet). (Dick to e-mail me a copy or mail hard copy) Once SIEBA and I rework the booklet we will review it with John and Lori for final approval.

Thanks,

Ken

Cc John Worts
   Lori Prichard