UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
CATHERINE V. SIKORSKI and JOHN SIKORSKI

                    Plaintiffs,                    07 CIV 3906(CLB) (LMS)

       -against-                         ATTORNEY AFFIDAVIT
                                                 IN OPPOSITION TO
                                                 MOTION TO DISMISS
FULTON CHEVROLET-CADILLAC CO., INC.        OF SIEBA, LTD
FULTON CHEVROLET CO., INC., HIGH POINT
CHVEROLET, INC., SIEBA, LTD., FULTON/HIGH
POINT CHEVROLET GROUP HEALTH BENEFIT
PROGRAM and JOHN DOES "1" through "3",

                    Defendants.
------------------------------------------------------------------X

       Phyllis A. Ingram, an attorney duly admitted to practice law before the United States District Court, Southern District of New York, affirms under penalty of perjury:

       1.     I am an associate of the law firm Burke, Miele & Golden, LLP, attorneys for defendants, Fulton Chevrolet-Cadillac Co., Inc., Fulton Chevrolet Co., Inc., High Point Chevrolet, Inc (herein after Fulton/Highpoint Chevrolet) and Fulton/High Point Chevrolet Group Health Benefit Program (herein after "the Plan"). This affirmation is submitted in opposition to the motion to dismiss of Sieba, Ltd. (herein after "Sieba") As set forth herein, the annexed exhibits, the accompanying memorandum of law and based upon the contents of the annexed affidavit of Lori Pritchard, Office Manager of Fulton Chevrolet-Cadillac Co., Inc., it is respectfully submitted that the motion to dismiss of Sieba should not be granted as an issue of fact exists as to its duties and obligations to the Plan and its assets.

2. Contemporaneously served with these opposition papers are defendants' answer to the plaintiffs' amended complaint as well as a third party summons and third party complaint brought by the defendants herein against, Ken Hutchings and the Anchor Group. (A copy of the defendants' answer is annexed hereto as exhibit "A" and a copy of the third party summons and complaint is annexed hereto as exhibit "B").

3. Fulton/High Point Chevrolet is in the business of buying and selling automobiles. (See affidavit of Lori Pritchard annexed hereto as exhibit "C").

4. Upon information and belief, in our about 1997, Fulton/Highpoint Chevrolet established a self-funded employee medical benefits plan for the employees of the Fulton Chevrolet and High Point Chevrolet. At that time, an Employee Plan Booklet was apparently created which contained a Summary Plan Description. Upon information and belief, whether any other Plan Documents were created is not currently known. The Summary Plan Description attached to the Plan Booklet identifies the Plan Sponsor as Fulton/High Point Chevrolet and the Plan Supervisor/Third Party Administrator as W.J. Jones. (See Employee Health Benefit Plan which was annexed to Sieba's attorney affidavit as exhibit "B"). Sieba has admitted in its papers that it stepped into the shoes of W.J. Jones, thus becoming the Plan Supervisor/third party administrator of the Plan. Sieba seeks a dismissal of the plaintiffs' claims based upon the contention that it was merely a ministerial third party administrator pursuant to a service agreement and was not a Plan Administrator as defined by ERISA. The attached records, as well as the contents of the affidavit of Lori Pritchard, and the discussion of the law contained in the accompanying memorandum suggests the need for a contrary finding, especially at this early juncture in this litigation.

5. In our about September 2000, a Service Agreement was entered into between Sieba, Fulton/High Point Chevrolet and Diversified Concepts, Inc. which established the various entities duties and responsibilities with respect to the Plan. (A copy of that Agreement was annexed to Sieba's motion to dismiss as Exhibit "C" to the Declaration of Peter L. Contini). It is contended by Sieba that based upon the provisions of this Agreement it was not a Plan Administrator as defined by ERISA but was merely relegated to provide ministerial third party administrative services. An examination of the terms of the Service Agreement and in particular the first paragraph in Article 2 entitled, "Administration Services to be Provided" and its subparagraph (f) reveal that Sieba's function pursuant to the Agreement was more than ministerial in nature and in fact included discretionary functions.

6. Pursuant to Article 2, "Sieba shall discharge its duties with respect to the Medical and Dental Plan (a) solely in the interest of participants, (b) for the exclusive purpose of providing benefits to participants, (c) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (d) in accordance with the Plan(s) and this Agreement. As set forth in the accompanying memorandum of law, this language mirrors the language found in 29 USC 1104(a) entitled "Prudent man standard of care" which sets forth the standards to be followed by a fiduciary under a Plan. In addition, subparagraph (f) of Article 2 explicitly states that it (Sieba) "shall, to the extent possible, **advise** the Broker Consultant (initially Diversified Concepts and later Anchor Group) and Contract Holder (Fulton/High Point Chevrolet) as to matters which come to its attention involving

3

the potential legal actions involving the Plan(s) and shall **advise** the Broker Consultant and Contract Holder in writing of legal actions commenced against the Contract Holder which come to its attention in an expeditious manner (emphasis added)." This provision also requires Sieba to defend any legal action involving a claim for benefits under the Plan if the action arises out of the negligence, recklessness or intentional misconduct of Sieba or their failure to abide by this contract or applicable laws. Based upon the language cited above, it is apparent that Sieba was not merely relegated to ministerial functions under the terms of the Agreement as it contends. In fact, the aforesaid language reflects that Sieba was empowered to make discretionary decisions with respect to Plan assets and was indeed was not only required to notify Fulton/Highpoint Chevrolet should those Plan assets be put at risk by potential or pending litigation, it was authorized to control litigation which could ultimately affect the Plan's assets.

7.  That Sieba's function was more than ministerial in nature is also reflected in the copy of a Specific Claim Notification/Initial Filing form annexed hereto as Exhibit "D" which was made a part of Plaintiffs' Rule 26(a) disclosure. It is apparent from this claim notification which was completed by Karen Baxendale of Sieba in June of 2002 that Sieba was obligated to consider whether a particular claim might exceed the specific deductible of $20,000.00 and thus trigger the need for coverage under the Avemco policy. It is also clear that in this case, Sieba considered that the Mrs. Sikorski's claim might exceed the specific deductible and therefore submitted the initial filing to Avemco. It does not appear from this document that Fulton/High Point Chevrolet was aware of this action taken by Sieba. Also annexed as part of Exhibit "D" is the Sieba Claim Payment Detail which was also part of the plaintiffs' Rule 26(A) disclosure and which is dated

4

6/06/02. It appears from the Payment Detail that as of June 6, 2002 Mrs. Sikorski's medical claims total was $14,560.14. The previously referred to Specific Claim Notification form indicates that the Large Case Management amount which had been implemented by Sieba was in the amount of $15,517.36 which included a NYHCRA surcharge. Also annexed hereto as exhibit "D" is a memo dated 4/11/02 which was also made a part of Plaintiffs' Rule 26(A) disclosure from Kate Rogers to Karen Baxendale (both of whom upon information and belief were Sieba employees at the time) which reflects that as of that date, Mrs. Sikorski was a stop loss claimant with a $13,000 hospital stay and that there was "potential more to come." These documents clearly demonstrate that Sieba exercised its discretion as to when and if to submit a claim to the stop loss carrier and thus indicates its discretionary authority over Plan assets.

8.  As attested to by Lori Pritchard, at the time Fulton/High Point Chevrolet chose to terminate its self funded plan, a three-month run out extension premium was purchased by Fulton/Highpoint Chevrolet and paid to Sieba. As also attested to by Lori Pritchard, Fulton/Highpoint did not pay a separate premium for coverage under the Avemco policy. Rather it paid a monthly premium statement to Sieba. Accordingly, based upon Fulton/Highpoint Chevrolet's prior premium payment history with Sieba, and respresentations made to it by Sieba's president at a meeting held in June 2002, it was Fulton/Highpoint Chevrolet's understanding that the three month extension it purchased included coverage under the Avemco policy. (see Lori Pritchard affidavit Ex C) Based upon the contents of an April 11, 2002 internal document of Sieba's annexed hereto as a part of exhibit "D" which was also a part of Plaintiffs' Rule 26(A) disclosure, it appears that at the time of the meeting, Sieba was aware of Mrs. Sikorski's medical condition, of

5

the amount of her medical claims to date, and of the "potential of more to come." It also appears that Sieba submitted the stop loss notification to Avemco shortly after the aforesaid meeting, knowing that Fulton/Highpoint intended to change its employee health benefit plan and had apparently purchased a run out on the coverage provided under the Plan only and not afforded through Avemco's reinsurance policy.

9. Pursuant to the terms of the Service agreement, Sieba was obligated to protect the interests of the plan participants and in turn the interests of the Plan assets (see Article 2, of the Service Agreement). Yet, upon receipt of notification that the stop loss coverage was being terminated effective July 31, 2002, (see Ken Hutchings email dated Jully 22, 2002 annexed hereto as exhibit "E") Sieba apparently did not do so by failing to ascertain whether a "tail" policy of reinsurance had been purchased which would track its own three month run out extension bought and paid for by Fulton/High Point Chevrolet so as to protect the interests of Plan participants as it was required to do under the Agreement. Rather, Sieba seemingly took the position that it had no obligation to do so and turned a blind eye at the expense of Mrs. Sikorski and the Plan assets.

10. As further evidence that Sieba's duties extended beyond the mere ministerial, annexed hereto as exhibit "F" is a copy of 12/17/02 email sent from Karen Baxendale to Lori Pritchard in response to an email sent from Lori to Karen regarding payment of claims which indicates that Sieba acted in more than a merely ministerial function. As is readily apparent from the contents thereof, Sieba, in accordance with the Agreement, continued to administer claims for the six month period after the termination of the Agreement, advised Fulton/High Point Chevrolet regarding stop loss coverage, sought clarification from the stop loss carrier on coverage issues, and directed that

Fulton/High Point disburse an additional approximately $9,750.00 from the Plan's assets. (All of which took place after Sieba claims its run out expired and its obligations under the policy terminated) It is clear from the contents of this email that it was Fulton/High Point Chevrolet that took direction from Sieba as to the administration of claims and in particular, stop loss coverage, and not the other way around.

11.     In addition to the foregoing, the Employee Health Benefit Plan, paragraph entitled "Rights of Covered Employees" designates the Plan Supervisor (Sieba) as the entity with the authority to review the eligibility status for any claims. An amendment to the Plan entered into on June 16, 2002 clarified the time frame within which such reviews were to be made. The Plan Supervisor remained the entity to whom the request for review should be made in writing. A copy of the Amendment to the Plan is annexed hereto as Exhibit "G".

12.     Based upon the foregoing, it is apparent that a dismissal of the plaintiffs' claims against Sieba is not warranted. Although Fulton/High point Chevrolet believes that the foregoing is sufficient evidence to show that Sieba was the Plan Administrator and owed a fiduciary duty to the Plaintiffs as such, additional discovery is needed to determine the full extent to which Sieba acted in that capacity and thus a dismissal of the plaintiffs' action against it at this time should not be granted.

Dated: September 7, 2007
      Goshen, New York

                              **Burke, Miele & Golden, LLP**
                              **Attorneys for Defendants,**
                              **Fulton Chevrolet Cadillac Co., Inc.**
                              **Fulton Chevrolet Co., Inc.**
                              **High Point Chevrolet Co., Inc.**
                              **Fulton/High Point Chevrolet Group**
                              **Health Benefit Program**

By: _____
                     Phyllis A. Ingram, Esq. (0650)